**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 25-1514**

_____

ESTATE OF KATHERINE MONICA VICKERS, Rupa Vickers Russe as the Executor of the Estate,

Plaintiff - Appellant,

and

RUPA VICKERS RUSSE, individually,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:20-cv-00092-MR-WCM)

_____

Argued:  January 28, 2026                    Decided:  May 4, 2026

_____

Before DIAZ, Chief Judge, and THACKER and BERNER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:**  Nathan Ward Wilson, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellant.  Jonathan Douglas Letzring, OFFICE OF THE UNITED STATES

ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Rupa Vickers Russe, VICKERS RUSSE LAW, PLLC, Mars Hill, North Carolina, for Appellant. Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Katherine Monica Vickers was a veteran who died of sepsis in 2018. A year before her death, while under the care of doctors employed by the United States Department of Veterans Affairs ("the VA"), Vickers was diagnosed with an inoperable brain tumor estimated to have been present for at least five years.

In July 2020, Vickers' daughter, Rupa Vickers Russe ("Appellant") sued the VA pursuant to the Federal Tort Claims Act ("FTCA"). Appellant alleged that the negligence of two VA doctors had caused Vickers' brain tumor to go undiagnosed, and that her tumor diminished her quality of life and ultimately caused her death. The district court dismissed Appellant's claims as untimely and held in the alternative that they lacked merit.

Appellant argues that her claims were timely and that the district court erred by reaching the merits and holding that she was not entitled to relief. For the reasons set out below, we affirm.

I.

A.

Vickers' Medical History

Vickers was a Navy veteran who served during the Korean War. During her service, she was sexually assaulted by two officers. The attack left her with chronic post-traumatic stress disorder ("PTSD"). As a result, the VA awarded Vickers full service related disability in 1995. By that time, Vickers had also developed several serious physical conditions, including morbid obesity, fibromyalgia, and osteoarthritis. Vickers had also given birth to four children.

3

In the late 1990s, Vickers began to complain of severe headaches, which she said contributed to insomnia, fatigue, difficulty walking, and anxiety. In 2001, she underwent a neuropsychological evaluation at a VA hospital in Baltimore, Maryland, after she reported fears of early onset Alzheimer's disease. The attending physician determined that Vickers' PTSD was responsible for the neurological issues she had experienced.

Around the same time, Vickers also reported that she had been experiencing urinary incontinence for a while. For that, she saw a physician at the VA hospital in Washington, D.C. ("the D.C. VA"), who diagnosed Vickers with stress incontinence, caused when the pelvic floor muscles weaken to the point that they are unable to prevent small leaks from the bladder. Over the next several years, Vickers repeatedly complained to several different VA physicians that her condition was worsening. Each doctor that assessed Vickers concluded that her incontinence was most likely caused by a combination of factors including her morbid obesity, mobility issues, and past childbirths.

In 2002, Vickers returned to the D.C. VA to complain of a "new predominant right sided headache." J.A. 476.[1] Her physician ordered a CT scan of her head. That scan revealed "minimal cortical atrophy" typical of a person of Vickers' age and health but was "otherwise normal." *Id.* In April 2003, Vickers began to complain of "worsening cognition." *Id.* Her doctors ordered yet another study -- this time an MRI -- which revealed lesions on the "left inferior frontal periventricular." *Id.* at 477. The physicians diagnosed the likely cause as a lack of blood flow or vitamin deficiency but specifically found, "no

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

evidence of an intracranial mass, hemorrhage or acute [blood flow obstruction]," and "[n]o [accumulation of cerebrospinal fluid] is present." *Id.*

Vickers had a follow-up MRI in October 2003 after she experienced facial numbness and pain. The imaging "indicated normal results with the exception of an area of abnormal signal intensity in the left interior frontal white matter most likely representing post traumatic encephalomalacia." J.A. 477.

Vickers moved to Asheville, North Carolina, in 2006 to be closer to Appellant and Appellant's children. She established care at the Charles George VA Medical Center ("the Asheville VA"). On December 12, 2006, while at the Asheville VA, Vickers had her first appointment with Dr. Sarala Rajkumar, who would serve as Vickers' primary care provider for approximately fourteen months.

In 2007, Vickers began to display increasingly unusual psychological behavior, including agitation, aggression, forgetfulness, and stress. Her incontinence and blood glucose levels also worsened. Doctors at the Asheville VA diagnosed Vickers as diabetic but recommended that she attempt to manage the disease with dietary and lifestyle changes rather than insulin. Several months into her treatment, Vickers spoke with a VA nutritionist, Nancy Kukla. In her notes, Kukla observed that Vickers was unable "to retain any kind of technical nutritional information." J.A. 479.

In the spring of 2008, Vickers stopped seeing Dr. Rajkumar. Later that year, she underwent a hysterectomy. And around December 2009, she moved to Virginia and established care at a VA hospital in Washington, D.C.

5

Vickers moved back to Asheville in 2012 and resumed treatment at the Asheville VA. At that time, Dr. Lara Hume took over as her primary care physician. In her initial appointment with Vickers, Dr. Hume confirmed that Vickers was still suffering from several long term diseases, including PTSD, depression, morbid obesity, insomnia, osteoarthritis, diabetes, and severe urinary incontinence.

In July 2013, Vickers reported sudden, unexplained weight loss. Dr. Hume hypothesized that Vickers may have had a stroke but did not note any lingering effects.

In February 2014, Vickers again met with Dr. Hume, this time concerned about increased lethargy and psychological anguish. On July 1, 2014, she met for the first time with a mental health consultant, Dr. Angela Capozzi, at the Asheville VA. Vickers told Dr. Capozzi that she suffered from anxiety, depression, and poor cognition. But Dr. Capozzi wrote in her notes that Vickers did not display signs of mental incapacity. Consequently, Dr. Capozzi did not order testing to assess Vickers for cognitive impairment. Vickers did not follow up with Dr. Capozzi and never sought long term psychiatric or psychological care.

In August 2014, Dr. Hume noted that Vickers had unintentionally lost 35 pounds in the preceding two years. She ordered scans of Vickers' breasts, chest, abdomen, and pelvis. The results were "not normal," but did not show signs of any disease associated with weight loss. J.A. 484.

In April 2015, Vickers requested more neurological testing. She explained that she was having trouble walking and standing upright and believed a mold infestation in her home may have damaged her brain. Dr. Hume concluded that Vickers' osteoarthritis,

6

PTSD, depression, insomnia, and diabetes were the more likely causes of her discomfort and that tests for mold related nerve damage were unnecessary.  Six months later, Vickers complained of acute short term memory loss, which Dr. Hume diagnosed as a symptom of attention deficit disorder.  Two months after that, Vickers got lost on her way to an appointment at the Asheville VA.

Then, in May 2016, Vickers had an appointment at the Asheville VA with Kukla, her nutritionist, to discuss management of Vickers' worsening diabetes.  Kukla recommended that Vickers begin an insulin regimen, and Vickers agreed.  But Kukla wrote in her notes that Vickers "does not seem able to take care of herself."  J.A. 487.  In fact, Vickers would later tell Kukla that she had "changed her mind" about starting insulin and had not been taking the drug.  *Id.*  Kukla concluded that Vickers was "habitually non-compliant" in her diabetes treatment and alerted other treating physicians that Vickers may have serious mental health issues impeding her medical care.  *Id.* at 489–90.  Appellant, who around this time began to take a more active role in Vickers' care, also encouraged Vickers to stop taking her insulin and attempt to manage her diabetes with diet and lifestyle changes.  Appellant explained to Kukla that Vickers experienced bouts of confusion and memory loss and thus may have been at risk of an insulin overdose.

Vickers later spoke with a social worker at the Asheville VA, Kay Holtzinger. Holtzinger added a note to Kukla's file stating, "[i]f cognitive impairment is leading to noncompliance [with Vickers' treatment plan], please refer to mental health for cognitive screening."  J.A. 487.  Around the same time, Appellant attempted to schedule an appointment with Dr. Hume to discuss Appellant's concerns that Vickers was no longer

7

competent to manage her own medical care.  Vickers disagreed and asserted that she was well enough to live independently.

During a July 2017 check in call, Dr. Hume noted that Vickers was confused and had mistaken her for one of her male colleagues.  Dr. Hume suspected mild cognitive impairment and recommended an MRI.  But hours before the MRI was scheduled to take place, Vickers arrived at the Asheville VA's emergency room experiencing severe illness. Emergency room staff identified a "brain abnormality of significance" as the likely cause. J.A. 493.  A biopsy revealed that Vickers had an inoperable, stage two[2] brain tumor.  As a result, Vickers and Appellant had a consultation with Dr. Praveen Vashist in the Asheville VA oncology department.  Dr. Vashist explained Vickers' diagnosis and encouraged her to move to Durham, North Carolina, and establish care at the Duke University Medical Center.

Vickers moved into a nursing home in Durham later that month.  There, she executed a durable power of attorney, healthcare power of attorney, and disclosure authorization, all of which listed Appellant as the person with authority.  On August 23, 2017, Vickers and Appellant had an appointment with Dr. Dina Randazzo of the Duke Medical Center, who served as Vickers' neuro-oncologist.  Dr. Randazzo reiterated to Appellant and Vickers that Vickers had stage two brain cancer.  Dr. Randazzo also speculated that Vickers' tumor had been present for between five and ten years and that

---

[2] A stage two cancerous tumor is one in which the tumor shows signs of growth and may have spread to nearby lymph nodes. *Cancer Staging*, Cleveland Clinic (Aug. 5, 2024) [https://perma.cc/WJ8K-4NWM].

Vickers could survive for up to five additional years if the tumor responded well to chemotherapy.

On August 28, 2017, Appellant sent Dr. Hume a message through Vickers' secure messaging portal profile on the Asheville VA website. She wrote:

> Even though consistently the conversation was about [Vickers'] mental health function, the fact that [the licensed clinical social worker] did not think cognitive function was impaired was apparently why no one thought to check [Vickers] for a brain problem. However, cognitive function HAD to have been diminishing as evidenced by her urine-soaked lifestyle. The Duke neuro-oncologist thinks this likely is a very slow growing tumor, 5-10 years' worth that is now huge and spreading from the one side to the other side of her frontal lobe. This tumor could explain her noncompliance issues, bedwetting/lifestyle issues. Odd that no medical professional considered this as a possibility. . . . The VA has failed. This situation is not supposed to happen.

J.A. 496–97.

Between August 30 and September 4, 2017, Appellant exchanged several more messages with Dr. Hume regarding Vickers' care. But those messages did not concern the provision of medical care to Vickers from any VA personnel. Rather, it appears that the VA would not cover Vickers' treatment unless a VA physician supervised her care. But Appellant wanted Vickers to receive her medical care at Duke, rather than a VA facility. The solution was to "dual enroll[]" Vickers at both the Asheville and Durham VA facilities so that Durham VA personnel could oversee Vickers' treatment at Duke. J.A. 499. Dr. Hume helped to administer that arrangement but did not provide any direct medical services to Vickers after July 2017. Nor did Dr. Hume direct or supervise any of the care Vickers received at Duke.

9

In February 2018, Appellant sent another message to Dr. Hume requesting a formal referral to a neuro-oncologist that Dr. Randazzo had recommended.  The issue, as before, was that the VA would not cover Vickers' appointment with the neuro-oncologist unless Vickers received authorization from a VA physician.  "As you are still her [primary care provider]," Appellant wrote, "please prepare the appropriate consult."  J.A. 500–01.  Dr. Hume submitted that referral the next day.  A few days later, Dr. Hume also helped Appellant resolve a medication issue with Vickers' nursing home but did not write any prescriptions or otherwise direct medical treatment.  And a few days after that, Dr. Hume requested an appointment with Vickers and Appellant to "confirm [Vickers'] clinical stability," but the record indicates that she did so only so that the Asheville VA would dispense a medication prescribed by Dr. Randazzo.  *Id.* at 501.  Overall, Vickers' treatment went well, and her tumor shrank in response to the chemotherapy treatment she was receiving at Duke.

In June 2018, Vickers began to display "increasingly inappropriate sexual behaviors" at her nursing facility.  J.A. 502.  Nursing facility staff sent Vickers to the Asheville VA for a psychiatric evaluation.  Management at the nursing facility also advised VA personnel that Vickers would not be welcome back.  Anthony Smalls, a social worker at the Asheville VA, spent the next month attempting to place Vickers in a VA approved nursing home.  But few homes were willing to accept Vickers because of the incidents at her prior nursing home.  Smalls ultimately placed Vickers at Pruitt Health in Raleigh.

Early on the morning of October 16, 2018, Pruitt Health staff brought Vickers to the Duke emergency room.  Vickers was severely ill.  Duke medical personnel diagnosed her

10

with sepsis, as Vickers was running a fever, had a history of "multidrug resistant UTI," and was "covered in stool," some of which was dried and caked to Vickers' body. J.A. 2899–900. Vickers went into cardiac arrest less than 90 minutes after she arrived and died shortly thereafter. She was 83 years old. Vickers' death certificate, based on Duke's incident report, lists cardiac arrest as the cause of death with sepsis and "likely urinary tract infection" as acute underlying causes. *Id.* at 2895.

## B.

### Procedural History

On October 8, 2019, Appellant submitted an unsigned administrative complaint to the VA via a Standard Form 95 ("SF95") asserting a wrongful death claim pursuant to the FTCA. Appellant claimed that Dr. Rajkumar and Dr. Hume each failed to recognize the neurological basis of Vickers' symptoms and timely refer her to a neurologist. That delay, Appellant alleged, allowed Vickers' brain tumor to grow until it became inoperable, causing Vickers acute suffering and ultimately killing her. Because Appellant had not signed that SF95 as required by federal regulation, the VA rejected the filing and notified Appellant of the deficiency. She submitted a second SF95 on December 12, 2019. That version included a valid signature but was otherwise identical to the first. Appellant also claims to have submitted a third form to the VA shortly after mailing her second SF95 -- this time a VA Form 0381, used to submit civil rights complaints. The VA says it never received that submission.

11

On July 16, 2020, although the VA had not yet responded to her administrative claims, Appellant sued the United States in federal court pursuant to the FTCA.[3] She stated claims for medical malpractice, wrongful death, breach of contract, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), and gender discrimination arising out of Vickers' treatment at the Durham VA, the Asheville VA, and the VA hospital in Washington, D.C. The Government filed a motion to dismiss for lack of subject matter jurisdiction, failure to state a claim, and insufficient process.

On December 6, 2021, the district court granted the Government's motion in part and denied it in part. The court first dismissed Vickers as a deceased party, then dismissed Appellant's breach of contract claim after noting that the Court of Federal Claims has exclusive jurisdiction over contract claims against the federal government. Next, the district court dismissed Appellant's gender discrimination claim and all claims against the Durham and Washington, D.C. VA hospitals because Appellant had not raised those claims in her SF95s as required by the FTCA. But the court held that there was a genuine factual dispute as to whether Appellant's remaining claims were timely and thus allowed them to proceed to trial.

A four day bench trial began on March 16, 2023. In addition to her own testimony, Appellant proffered video depositions from three experts: Dr. Ellen Bondar, an internal medicine and primary care specialist; Dr. Henry S. Friedman, a neuro-oncologist and

---

[3] A week later, the VA informed Appellant that her lawsuit made her claim "not amendable [sic] to administrative resolution," and so issued a final denial on July 22, 2020. J.A. 175.

deputy director of the neurosurgery department at the Duke University Medical Center; and Dr. Edward Yun, a urologist. The Government introduced testimony from its own three experts: Dr. John Spangler, a primary care and family medicine specialist; Dr. Julian Bailes, a neurosurgeon; and Dr. Paul Hatcher, a urologist. Dr. Rajkumar and Dr. Hume also testified.

The court issued its written findings of fact and conclusions of law on June 11, 2024. The threshold issue of the case, it noted, was whether Appellant had satisfied the FTCA's statute of limitations by presenting her claims in a valid SF95 within two years of accrual. The court first found that Appellant and Vickers knew no later than August 30, 2017, that Vickers had an inoperable brain tumor that had been present for at least five years. Because an FTCA claim ordinarily accrues on the date a plaintiff knows or should know of a possible cause of action, the court held that Appellant's claims had accrued on that date. But because Appellant had not submitted her first SF95 until October 2019, the court held that her claims would have been untimely even if Appellant's initial submission was valid. The district court also rejected Appellant's arguments that the continuous care doctrine tolled the FTCA's time bar and that Vickers was entitled to equitable tolling. Thus, the court concluded, Appellant's claims were barred as untimely.

But "in the interest of assisting those who may hereafter need to review this record," the court then proceeded to make factual findings and alternative legal conclusions concerning the merits of Appellant's claims. J.A. 473, 506.

The district court concluded that Appellant had failed to prove negligence by either Dr. Rajkumar or Dr. Hume, primarily because Appellant's experts could not identify any

13

point at which a reasonable physician would have behaved differently than Vickers' doctors had. The court also determined that Appellant had failed to establish Vickers' brain tumor as a proximate cause of either her ailments or death. Consequently, the court held that even if Vickers' doctors had negligently misdiagnosed Vickers' tumor, Appellant could not prove that negligence had proximately caused any cognizable injury.[4]

The district court entered final judgment in favor of the Government on June 11, 2024, and dismissed Appellant's case with prejudice. On July 9, Appellant moved for reconsideration pursuant to Rule 59(a)(2) of the Federal Rules of Civil Procedure. The court denied that motion on March 11, 2025. Appellant timely appealed.

## II.

Appellant raises four arguments on appeal: (1) her claims were timely; (2) the district court should not have dismissed her gender discrimination claim; (3) the district court should not have reached the merits after dismissing her claims as untimely; and (4) the district court made clearly erroneous factual findings. As we explain below, we assume without deciding that Appellant's claims were timely pursuant to the continuous care doctrine. But we nonetheless hold that Appellant's gender discrimination claim was unexhausted, that the district court did not err in proceeding beyond the timeliness issues, and that Appellant's remaining claims fail on the merits.

---

[4] The district court also held that Appellant had not proven her IIED or NIED claims. Appellant does not challenge those holdings on appeal.

14

A.

Timeliness

The threshold issue in this case is whether Appellant's claims were timely presented to the VA as required by the FTCA. In addressing this issue, we review a district court's factual findings following a bench trial for clear error and its legal conclusions de novo. *Al Sabah v. World Bus. Lenders, LLC*, 160 F.4th 540, 549–50 (4th Cir. 2025).

1.

The Ordinary Rule

The FTCA requires any tort claim against the United States or one of its agencies to be "presented in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). Adequate presentation requires submission of the claim to the relevant agency on an SF95 or an equivalent form. *Ahmed v. United States*, 30 F.3d 514, 517 (4th Cir. 1994). "State law determines whether there is an underlying [FTCA] cause of action; but federal law defines the limitations period and determines when that cause of action accrued." *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991). In the Fourth Circuit, a medical malpractice claim ordinarily accrues when the claimant learns or should learn of the existence and cause of an injury. *Id.* It is not necessary that the claimant understand the injury to have been *negligently* inflicted, but only that they are aware of the fact of the injury and its general cause. *United States v. Kubrick*, 444 U.S. 111, 123 (1979). At that time, the onus is on the plaintiff to discern whether they have a cause of action, and to do so within two years.

15

Doctors at the Asheville VA biopsied an abnormality in Vickers' brain on July 27, 2017, and identified it as an inoperable tumor. Three days later, Appellant and Vickers had a consultation with Dr. Vashist of the Asheville VA, who confirmed Vickers' diagnosis and reviewed treatment options with Vickers and Appellant. Dr. Vashist informed Appellant and Vickers that surgery was not an option. Vickers and Appellant then had an initial consultation at Duke with Dr. Randazzo on August 23, 2017. Dr. Randazzo confirmed that Vickers' tumor was inoperable and estimated that it had been developing for between five and ten years. On August 29, Vickers had a second MRI at Duke that confirmed her earlier diagnoses.

During that treatment, Appellant sent Dr. Hume two relevant messages. In the first, sent August 28, 2017, she said:

> [Dr. Randazzo] thinks this likely is a very slow growing tumor, 5-10 years' worth that is now huge and spreading from one side to the other of [Vickers'] frontal lobe. . . . Odd that no medical professional considered this a possibility. . . . The VA has failed. This situation is not supposed to happen.

J.A. 496–97. In Appellant's second message, sent August 30, she again explained that Duke physicians believed Vickers' tumor to be inoperable and to have been present for at least five years. She also added that Dr. Randazzo believed the tumor would have been "operable with good results if it wasn't so large." *Id.* at 498.

As the district court correctly concluded, these messages demonstrate that no later than August 30, 2017, both Vickers and Appellant knew and were aware that (1) Vickers had a large, stage two cancerous brain tumor; (2) the tumor had been present and detectable for not less than five years; and, (3) in Dr. Randazzo's opinion, the tumor could have been

16

surgically removed if it had been discovered earlier. Thus, Appellant knew or should have known of the alleged injuries and their general causes no later than August 30, 2017. Under the ordinary rule, Appellant's claims thus accrued on August 30, 2017. Yet Appellant did not submit her first, unsigned SF95 until October 2019. Because Appellant's claims were not "presented in writing to the [VA] within two years after [they] accrue[d]," they are untimely. 28 U.S.C. § 2401(b).

Appellant offers two arguments in rebuttal. First, she claims that the district court erred because it never established that Vickers "had notice of *who* caused the injury, let alone that she understood she suffered an injury." Appellant's Br. at 22. Second, Appellant claims that Vickers was unaware of any negligence by Dr. Rajkumar until September 2019, when Vickers and Appellant obtained Vickers' medical records from her time under Dr. Rajkumar's care. The records contradict those arguments. Appellant's own words prove that both Vickers and Appellant learned by August 30, 2017, that Vickers had a brain tumor that had been present for not less than five years, but which Dr. Hume and Dr. Rajkumar had not diagnosed. Appellant does not point to any facts that might cast doubt on those findings. Consequently, we hold that the district court correctly found that Appellant's claims were filed after the statute of limitations had run.

2.

The Continuous Care Doctrine

Appellant argues that even if her claims were untimely under the ordinary rule, they are preserved by the continuous care doctrine. The continuous care doctrine tolls the FTCA's time bar for medical malpractice claims "so long as the claimant remains under

17

the 'continuous treatment' of a physician whose negligence is alleged to have caused the injury." *Miller*, 932 F.2d at 304. But as we have explained, "the rationale for this tolling theory only permits its application when the treatment at issue is for the same problem and by the same doctor, or that doctor's associates or other doctors operating under his direction." *Id.* at 305. That is, the continuous care doctrine tolls a statute of limitations for a medical malpractice claim only so long as the negligent physician continues to treat the patient in a manner relevant to the underlying injury or advises or directs those who do. *Id*. at 305–06.

Appellant alleges malpractice by two physicians: Dr. Rajkumar and Dr. Hume. It is undisputed that Dr. Rajkumar treated Vickers only "[f]rom December 2006 until Spring 2008." Appellant's Br. at 4. Consequently, the continuous care doctrine cannot toll any claims that accrued against Dr. Rajkumar after Spring 2008. Here, Appellant's claims accrued no earlier than July 2017, when Vickers first learned of her brain tumor. Thus, the continuous care doctrine cannot alter the untimeliness of Appellant's claims against Dr. Rajkumar.

Dr. Hume became Vickers' primary care physician in 2012. And it is undisputed that Dr. Hume continued in that role at least until July 2017. But beyond that point, the record is ambiguous. On the one hand, in August 2017, Vickers moved to Durham, North Carolina -- more than 200 miles away from Dr. Hume's Asheville office -- and began receiving care at Duke. On the other hand, the record also indicates that Appellant continued to consult Dr. Hume about the care Vickers received at Duke.

18

Because we dispose of this case on the merits, we do not need to resolve this ambiguity. Instead, we assume without deciding that the continuous care doctrine applies, and thus that Appellant's claims were timely for the purposes of this appeal.[5]

B.

Exhaustion

Even assuming that Appellant's claims were timely, the district court held that Appellant failed to present her gender discrimination claim to the VA, and that, as a result, the claim is unexhausted. Appellant argues that this holding was in error. This is a question of law that we review de novo. *Est. of Van Emburgh ex rel. Van Emburgh v. United States*, 95 F.4th 795, 799 (4th Cir. 2024).

1.

The FTCA requires claimants to "present" their claims to the appropriate agency within two years of accrual. 28 U.S.C. § 2401(b). A claim is "presented" "when a Federal agency receives from a claimant . . . an executed [SF95] or other written notification of an incident, accompanied by a claim for money damages." 28 C.F.R. § 14.2(a). The claimant meets their burden of notice only if the description of the claim included in the SF95 is "sufficient to enable the agency to investigate" the alleged wrongdoing. *Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994).

---

[5] Appellant also argues that Vickers' claims were timely because Vickers was mentally incompetent to understand her legal rights and interests, and thus that she was entitled to equitable tolling of the statute of limitations. Because we assume that the claims were timely pursuant to the continuous care doctrine, it is unnecessary to reach these alternative argument.

Appellant claims that the Asheville VA discriminates against women by operating a high quality, specialized nursing facility for sexually dangerous men but no similar facility for women. Appellant argues that this discrimination harmed Vickers by causing her to be placed with Pruitt Health, which she terms a "substandard three star" nursing facility, after she was evicted from her first nursing home due to her "inappropriate sexual behaviors." Appellant's Br. at 37; J.A. 502.

The Government moved to dismiss this claim, arguing that it had not been presented to the VA in either of Appellant's SF95s. A magistrate judge recommended granting that motion after finding that Appellant's SF95s lacked any "suggesti[on] Ms. Vickers was discriminated against because of her gender," and rather stated only that Vickers was relocated "'because [the] Asheville VA did not have an appropriate facility' for Ms. Vickers based on her age, physical limitations," gender, and vulnerability as a cancer patient. J.A. 93. The district court accepted that recommendation and granted the motion to dismiss.

Before us, Appellant argues, "notice of the claim of discrimination based on Ms. Vickers being a female was clearly articulated in the SF 95." Appellant's Br. at 38. We disagree. As the magistrate judge and district court found, the SF95s contain no reference to discrimination, equal protection, or civil rights, and make only passing reference to Vickers' gender. The relevant portion of Appellant's SF95 reads, in full:

> "At the time of [Vickers'] death, she was in a VA authorized CNH Facility [Pruitt Health] because the Asheville VA did not have an appropriate facility for a female veteran of [Vickers'] age with the physical limitations she had and with the environmental vulnerability she had due to the limited cognition

20

caused by the large brain tumor, that was safe for her as a female veteran with [REDACTED] tendencies."

J.A. 3308.  Thus, this claim was not properly presented in Appellant's SF95s and is unexhausted.

2.

In the alternative, Appellant argues that she was not required to present this claim to the VA because it arises under the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, rather than the FTCA.  But the complaint never mentions the ACA.  Instead, it plainly states, "[t]his case is commenced and prosecuted against the United States of America pursuant to and in compliance with . . . the Federal Tort Claims Act."  J.A. 19.  Nor did Appellant mention the ACA in any of her motions to amend the complaint or at any other point before the district court.  We will not consider issues presented for the first time on appeal absent extraordinary circumstances.  *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020).  Seeing none here, we decline to take up this issue.

C.

Merits

We next address the district court's alternative legal conclusions on the merits of Appellant's claims.

21

1.

Standard of Review

As we noted above, following a bench trial, we review a district court's legal conclusions de novo and its factual findings for clear error. *Al Sabah*, 160 F.4th at 549–50.

2.

Jurisdiction

Appellant argues as a threshold matter that the district court lacked jurisdiction to make factual findings and legal conclusions after holding that Appellant's claims were time barred. To be sure, the FTCA does contain some jurisdictional elements. We held in *Estate of Van Emburgh ex rel. Van Emburgh* that there are three: (1) the claim must be presented to the appropriate federal agency; (2) the claim must be accompanied by a statement of the sum the petitioner seeks in redress; and (3) the petitioner must not sue until six months after the date of presentment or the date on which the agency issues its final disposition on the claim, whichever is first. 95 F.4th at 801. And if even one of these jurisdictional requirements has not been satisfied, a court may not reach the merits of the underlying claim. *Id.* at 801, 806 (explaining that the "three statutory requirements [within the FTCA] are jurisdictional" and affirming dismissal of a claim that did not include a statement of the sum sought in redress).

But significantly, the timing requirement of the FTCA is not jurisdictional. *See Wong*, 575 U.S. at 412 (holding that the FTCA's two year statute of limitations is non-jurisdictional and thus may be equitably tolled). Therefore, because the district court

dismissed Appellant's claims for untimeliness, it retained jurisdiction to proceed to the merits. The one exception was Appellant's gender discrimination claim, which the court dismissed as unpresented. *See id.* (explaining that courts lack jurisdiction to reach the merits of a claim that has not been presented to the appropriate agency). But the district court never reached the merits of that claim and thus committed no legal error.

3.

Standard of Care

Appellant also argues that the district court wrongly applied a local standard of care to her negligence claims, rather than a national standard. In support of her position, Appellant claims, "[b]oth parties' [primary care] expert witnesses agreed that a national standard of care applied to the [primary care] providers at the Asheville V.A." Appellant's Br. at 44.

Appellant is wrong. State substantive law applies in FTCA suits. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) (explaining that "[s]tate law determines whether there is an underlying cause of action" in an FTCA suit). To prove a medical malpractice claim in North Carolina, a plaintiff must show that a physician fell short of the applicable standard of care and thereby injured the plaintiff. *Connette for Gullatte v. Charlotte-Mecklenburg Hosp. Auth.*, 876 S.E.2d 420, 61–62 (N.C. 2022). North Carolina's medical malpractice standard of care is defined by statute as follows:

> [T]he defendant health care provider shall not be liable . . . unless the trier of fact finds . . . that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar

23

communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action.

N.C. Gen. Stat. § 90-21.12(a).  That is, North Carolina employs a localized standard of care, not a national standard.  *See Miller v. Carolina Coast Emergency Physicians, LLC*, 876 S.E.2d 436, 442, 447 (N.C. 2022).  The district court thus applied the correct standard of care.

### 4.

### Factual Findings

Finally, Appellant argues that the district court made clearly erroneous factual findings regarding the merits of her medical malpractice claims.  Her arguments take essentially two forms.  First, she argues that the court clearly erred in finding that neither Dr. Rajkumar nor Dr. Hume had fallen below the standard of care.  Second, she argues that the court was clearly wrong to find that Vickers' brain tumor was not the proximate cause of either her death or a diminution in her quality of life.

### a.

### Duty of Care

Appellant argues that Dr. Rajkumar and Dr. Hume fell below the standard of care in two ways.  First, she argues that a reasonable North Carolina physician would have conducted more extensive review of Vickers' medical records and recognized that Vickers' "constellation of symptoms" suggested that Vickers had an undiagnosed neurological disease.  Appellant's Br. at 50.  Second, she argues that any reasonable physician would have referred Vickers to a neurologist based on the totality of her symptoms.

24

The district court held that Appellant had not proven either claim. The primary issue was that Appellant's expert witnesses applied a national rather than a local standard of care, and even so, could not identify any particular moment at which either Dr. Rajkumar or Dr. Hume had acted unreasonably. The Government's expert witnesses, by contrast, demonstrated familiarity with the local standard of care and credibly testified that neither Dr. Rajkumar nor Dr. Hume were negligent in their care of Vickers. Their conclusions were based in large part on the close association of Vickers' symptoms with several diagnosed, well documented, and long standing conditions, including her morbid obesity, unmanaged diabetes, and chronic PTSD. The Government's experts thus concluded that, even in the aggregate, Vickers' symptoms did not give rise to a reasonable inference of undiagnosed neurological disease.

Appellant fails to offer a persuasive explanation as to why these findings are clearly wrong. She argues that Dr. Rajkumar did not incorporate Vickers' 2003 neurological exam into Vickers' medical records, and that Dr. Hume did not update Vickers' "problem list." Appellant's Br. at 45–48. But Appellant never explains how these alleged failures breached the local duty of care. As the district court explained, the evidence instead shows that a reasonable physician would have conducted a more thorough review of Vickers' records only if available information suggested the presence of an undiagnosed condition. And because all of Vickers' symptoms could be explained by her co-morbidities, no such suggestion arose. Even if Vickers' doctors had conducted a more thorough review, they would not have found any additional evidence that suggested neurological disease, as the physicians who conducted the 2003 exam specifically noted, "[t]here is no evidence of an

25

intracranial mass, hemorrhage . . . acute [blood flow obstruction]," or other disease. J.A. 477.

Consequently, the district court did not clearly err in finding no relevant breach of duty.

b.

Causation

Last, Appellant alleges error in the district court's finding that Vickers' brain tumor did not cause either Vickers' death or a diminution in her quality of life.

Appellant proffered a video deposition from Dr. Yun, a urologist, who hypothesized that Vickers' tumor could have caused her chronic urinary incontinence, which in turn caused Vickers to experience frequent urinary tract infections. Those infections, he continued, caused Vickers' doctors to over prescribe antibiotics, ultimately leading to a drug resistant infection, which then caused the sepsis that killed Vickers. The district court found Dr. Yun's testimony not to be credible for three reasons. First, the court noted that Dr. Yun never explained how a brain tumor can cause incontinence. Second, Dr. Yun conceded that obesity and diabetes commonly cause incontinence, whereas only a small minority of patients with brain tumors experience that symptom, suggesting that Vickers' co-morbidities were much more likely to be the cause of her symptoms. Finally, the court found Dr. Yun's theory to be "so attenuated as to not constitute proximate caus[ation]." J.A. 517.

Dr. Hatcher, who is also a urologist, testified for the Government. Contrary to Dr. Yun's theory, Dr. Hatcher concluded that Vickers' incontinence was caused by her

26

co-morbidities. Dr. Hatcher thus concluded that Vickers' brain tumor was not the cause of her death because it is undisputed that the most immediate cause was sepsis related to a drug resistant urinary tract infection. The district court found Dr. Hatcher's testimony much more credible than Dr. Yun's.

The district court confronted similar issues regarding Appellant's evidence that Vickers' brain tumor diminished her quality of life. To address this issue, Appellant proffered a video deposition from Dr. Friedman, a neuro-oncologist. Dr. Friedman testified that many of the symptoms Vickers experienced in her final years were attributable to her brain tumor. He also speculated that those symptoms diminished Vickers' quality of life and that they could have been mitigated or avoided if the tumor had been discovered sooner. But Dr. Friedman conceded that his conclusions were based on his presumption that Vickers' tumor would have been operable at an earlier stage. And he also conceded that operability is a question for a neurosurgeon, which he is not.

Dr. Bailes, a neurosurgeon testifying on behalf of the Government, disagreed with Dr. Friedman. Based on his review of Vickers' 2003 brain scans, Dr. Bailes explained that the tumor was already developing at that time but would have been nearly impossible to diagnose at that early stage. Dr. Bailes further explained that the tumor was of a type that is not operable at *any* stage but is highly responsive to chemotherapy.

The district court once again found the Government's witness more knowledgeable and credible. The court thus concluded, "[n]o actions or failures of [Dr. Hume], [Dr. Rajkumar], or any other health care provider at the [Asheville VA] were the proximate cause of any injury to Katherine Vickers or [of] her death." J.A. 523.

27

Again, Appellant does not point to any evidence that casts doubt on the district court's conclusions. Rather, Appellant merely repeats Dr. Yun's attenuated theory of causation and urges us to find a causal connection between Vickers' symptoms and her tumor merely because the two coincided. But as the district court found, the much more likely causes of Vickers' declining health and death were her age and multiple, unmanaged co-morbidities.

The law required Appellant to demonstrate by "the greater weight of the evidence" that Vickers' doctors caused her some cognizable injury. N.C. Gen. Stat. § 90-21.12(a). The district court was correct to find that she did not satisfy that burden.

## III.

For the foregoing reasons, the district court is

*AFFIRMED*.